**SPORTS TRAVELER, INC., Plaintiff,**

v.

**ADVANCE MAGAZINE PUBLISHERS, INC. d/b/a The Conde Nast Publications, Defendant.**

**No. 96 Civ. 5150(JFK).**

United States District Court, S.D. New York.

Sept. 30, 1998.

Colucci & Umans, New York City, of counsel Frank J. Colucci, for Plaintiff.

Strook & Strook & Lavan, New York City, of counsel Lawrence Rosenthal, for Defendant.

### ORDER AND OPINION

KEENAN, District Judge.

Before the Court is the motion of Defendant Advance Magazine Publishers, Inc. d/b/a/ The Conde Nast Publications ("Conde Nast") for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons that follow, the Court grants Conde Nast's motion.

### BACKGROUND

#### A. Sports Traveler Magazine

Plaintiff Sports Traveler, Inc. ("Sports Traveler") is a New York corporation organized in May 1995, which had its executive offices in New York City until Sports Traveler ceased operations in late 1996. *See* Affidavit of Lawrence Rosenthal in Supp. of Mot. for Summ. J. ("Rosenthal Aff."), Exh. 27, at 4; Affidavit of Charlotte Anne Perkins in opposition to Def's Mot. for Summ. J. ("Perkins Aff."), ¶ 1.

Sports Traveler is an entrepreneurial publisher of a start-up magazine entitled "Sports Traveler" ("Sports Traveler Magazine"), which is a magazine focused on women's participatory sporting activities, sports-related fitness and fashion, and sports-oriented travel. *See* Deposition of Charlotte Ann Perkins, Sept. 27, 1996; Feb. 13, 1997; Mar. 31, 1997 ("Perkins Dep."), at 294. The idea for Sports Traveler Magazine was developed in the summer of 1992 by Charlotte Anne "Polly" Perkins, the President, Publishing Director and controlling shareholder of Sports Traveler.

Sports Traveler did not have the ability or assets to develop the desired large circulation, either by subscription or newsstand sales, without the help of a large publisher. *See* Perkins Dep., at 103, 250. Therefore, in 1995, Perkins proceeded with the help of an investment partner, Jonathan Betts of Venture Partners, Ltd., to raise funds from private investors to produce and publish Sports Traveler Magazine. In about a year's time, Perkins had raised approximately $550,000 in funds. Although this is an extremely limited budget by publishing standards, Perkins published four issues of Sports Traveler Magazine. *Id.* at 13–14, 17–19.

The premiere issue, Fall–Winter 1995, of Sports Traveler Magazine was published on September 26, 1995. The three additional issues of Sports Traveler Magazine were: the Spring 1996 edition, published March 5, 1996; the Summer–Fall 1996 edition, published June 11, 1996; and the Fall–Winter 1996 edition published October 15, 1996. Sports Traveler Magazine effectively ceased publication after the fourth issue. *Id.* at 555.

#### 1. Sports Traveler Magazine's Trade Dress

The cover of Sports Traveler Magazine includes the registered trademark "Sports Traveler" depicted with the word "sports" boldly placed across the masthead in lower case helvetica (neue heavy extended) font typeface, and the word "traveler" in smaller, upper case, Caslon 540 font typeface underneath the word "sports." The letters in the logo slightly touch, or blend into, one another, and contrasting colors are used for the two words. The cover features a feminine, sports-oriented model depicted in an active setting. *See* Affidavit of Courtney Wilson, Esq. ("Wilson Aff."), Exhs. 46–49. These aspects of the cover of Sports Traveler Magazine have been consistent on all issues. Perkins Dep., at 110–111, 352. The last two issues contain the phrase "FOR THE ACTIVE WOMAN" above the "sports" line.

#### 2. The Performance of Sports Traveler Magazine

In connection with the launch of Sports Traveler Magazine, Perkins circulated 3,000

copies of a press kit (including a copy of the magazine) to "numerous advertisers, potential advertisers and the media" and another 5,000 copies of each issue were sent to a similar list. Perkins Aff., at ¶ 22. The idea of Sports Traveler Magazine attracted some attention from the media. There have been seventy-eight media references to Sports Traveler Magazine. Of the forty-four media references published before June 26, 1996, thirty were in the media trade press and fourteen were in consumer publications. Of these forty-four, five showed the cover. Overall, out of the seventy-eight total media references to Sports Traveler Magazine, only one of the five media references showing the cover was in a consumer publication.

Sports Traveler's advertising revenues exceeded one million dollars for the four issues of Sports Traveler Magazine. Perkins Dep., at 189. Advertisers such as Chanel, Ralph Lauren, Nike, BMW, Tag Heuer, and Saab placed ads in Sports Traveler Magazine. *See* Perkins Dep., at 17", 335.

Total distribution for all four issues of Sports Traveler Magazine exceeded 600,000 copies. Perkins Aff., ¶¶ 12, 15–17, 22. Of these 600,000 copies, 588,291 were sent out for national and direct distribution. Although 600,000 copies of the four issues were printed, not all of these copies were actually displayed. Perkins complained that her national distribution was unsuccessful because of "prematures", the practice of newsstands who received deliveries of her magazine, returning them to the distributor undisplayed. Rosenthal Reply Aff., Exh. 63, at 250–53. In fact, the sell-through total of Sports Traveler Magazine through national distribution was 11% and through direct distribution was 50%, meaning that only 75,697 of the Sports Traveler Magazines put into distribution were purchased. *See* Perkins Aff., at ¶ 12. In addition, subscriptions to the magazine totaled 14,630. Of these 14,630, 1,485 were a result of subscriptions from insert cards in Sports Traveler Magazine, and 13,145 were from orders placed with CAP Systems, an alternative subscription service. *Id.* at

¶¶ 18–20. As of June 26, 1996, Sports Traveler had sold 60,340 magazines and had at most 1485 subscriptions to Sports Traveler Magazine.[1]

### B. Conde Nast's Sports for Women Magazine

Conde Nast, a New York corporation, is a well known publisher of a broad range of upscale magazines including Self, Glamour, Vanity Fair, Mademoiselle, Vogue, GQ, Allure, Conde Nast Traveler, and Gourmet. Over the last several years, Conde Nast has engaged in a campaign to promote the Conde Nast name among advertisers and consumers. That campaign included advertising, adding the Conde Nast name to the title of certain of the magazines and citing on the cover of at least one magazine that it is from the publisher of other of Conde Nast's magazines. *See* Rosenthal Aff., Exh. 33, at 17–19; *Id.* Exh. 37. Conde Nast has rebranded several of its magazines to include the Conde Nast name. Specifically, Conde Nast has renamed Bride's Magazine as Conde Nast Bride's and relaunched House and Garden magazine in 1996 as Conde Nast House and Garden. The cover of Conde Nast Bride's has in its upper right corner "FROM THE PUBLISHERS OF VOGUE GLAMOUR Mademoiselle." *Id.* Exh. 10; Exh. 33, at 18. Additionally, Conde Nast's travel magazine was named Conde Nast Traveler, and its new women's sports magazine, which is the subject of the instant litigation, is titled Conde Nast's Sports for Women ("Sports for Women").

### 1. Conde Nast's Attempts to Create a Women's Sports Magazine

In 1994 Conde Nast became interested in publishing a woman's sports magazine. Eventually, after certain ideas were scrapped and other negotiations broke down, Conde Nast launched Sports for Women in 1996. In early 1994, Conde Nast considered a magazine directed at women's spectator sports initially referred to as Street & Smith's Sportswoman, College Edition. *Id.* Exh. 12.

---

1. The documentary evidence produced by Plaintiff concerning the number of subscriptions as of June 26, 1996 is inconclusive. Plaintiff has submitted a document that indicates that as of May 27, 1997 it had 1485 subscriptions. For the purposes of this motion, the Court will assume that this is the number of subscriptions as of June 26, 1996.

Later in 1994, Conde Nast personnel put together a prototype of a woman's sports magazine entitled Sportswoman, but the project was abandoned on May 24, 1994 by Steven T. Florio, currently Conde Nast's President and Chief Executive Officer, who stated that the idea should be reviewed again in "3–5 months." *Id.* Exh. 33, at 26–27, 78; Wilson Aff., Exh. 27; Udell Aff., at ¶ 6 (stating that the date of this letter was May 24, 1994, not May 24, 1995 as Plaintiff suggests).

In Spring/Summer 1994, Perkins presented her prototype boards for Sports Traveler Magazine to Sal Schiliro, then President of the Street & Smith division of Conde Nast. A meeting between Perkins and Florio was scheduled for June 10, 1994, but when Perkins arrived for the meeting Florio came out and cancelled the meeting. Florio Dep., at 44–45; Perkins Dep., at 215–216; 335–36.

On January 5, 1995, Lucy Danziger sent a letter to James Truman, the Editorial Director of Conde Nast, soliciting employment on Conde Nast's rumored women's sports magazine project. Danziger had learned of Conde Nast's project when someone from Conde Nast contacted her husband's photography gallery looking for images of women doing sports. Danziger Dep. at 40. On October 1, 1995, Conde Nast hired Danziger as an independent contractor to develop a prototype for a women's sports magazine. Danziger was not given any guidelines or direction by Conde Nast and, instead, created her own guidelines for the prototype based on the ideas expressed in her January 23, 1995 letter to James Truman. *Id.* at 47–48. In April 1996, Danziger was hired as a full-time employee of Conde Nast, and named Editor–in–Chief of Sports for Women. Newhouse Dep., at 40–44; Truman Dep., at 19, 25.

During the Summer of 1994, Danziger had become associated with Perkins. Perkins and Danziger met on multiple occasions to discuss the editorial mission, development and staffing of Sports Traveler Magazine. During this time, Danziger was privy to Perkins' ideas and concepts for the magazine, and reviewed the prototype boards and the original business plan for Sports Traveler Magazine with Perkins. Perkins Dep., at

191–195, 209–210, 326–329. Danziger was very interested in working for Sports Traveler, if Perkins could come up with the right financing. *Id.* at 206, 326–27. Danziger obtained her position with Conde Nast after her negotiations with Perkins fell through.

On November 2, 1995, less than six weeks after the first edition of Sports Traveler Magazine debuted on the newsstands, Florio, who had already seen the premiere issue of Sports Traveler Magazine, telephoned Perkins and requested a meeting with her to discuss Conde Nast's interest in acquiring Sports Traveler Magazine and hiring Perkins. Florio Dep., at 11–14, 31–32, 39. Danziger also saw the premiere issue of Sports Traveler Magazine, and sent Perkins a congratulatory note dated October 22, 1995. Danziger Dep., at 34. Danziger subsequently saw the second issue of Sports Traveler Magazine on February 13, 1996 right after she made a design presentation to S.I. Newhouse, an executive at Conde Nast, because "someone" in the company, "possibly James Truman," had the magazine and showed it to her. *Id.* at 36–37. She also saw the third issue which came out in June, 1996, of Sports Traveler Magazine because "someone" had it in the office. *Id.* at 38.

On December 5, 1995, Perkins met with Florio and Newhouse for over an hour in Florio's office at Conde Nast. Perkins Dep., at 168, 172–176, 179. On December 8, 1995, Perkins received a letter by hand from Florio stating that Sports Traveler Magazine did "not fit in" with Conde Nast's "continuing plans" for developing a women's sports magazine.

On January 4, 1996, a news article appeared announcing that Conde Nast was working on a sports magazine for women with a working title "Jump." In fact, on December 1, 1995, Conde Nast's counsel conducted a trademark search on Jump and on January 29 and 30, 1996, the first "Jump" business plans were completed. *See* Wilson Aff., Exh. 21. When the name "Jump" proved unworkable, Conde Nast considered the title Conde Nast Sport for Women (with a singular sport) and its counsel, Sabin, Bermant & Gould, obtained a 186 page Trademark Search Report on "sport" in the U.S.

and Canada on March 4, 1996. Rosenthal Aff., Exh. 15. After further consideration, on March 15, 1996, Conde Nast Sports for Women (with a plural Sports) was officially designated the title of the new magazine. *Id.* Exh. 16. The title remains Conde Nast Sports for Women, and there are no plans to change.

### 2. The Design of the Sports for Women Cover

On October 15, 1995, Conde Nast hired Lucy Sisman, head of Sisman Design, an outside design firm, to assist in the development of the prototype for Sports for Women. On February 13, 1996, Danziger and Sisman, made a presentation to S.I. Newhouse and other Conde Nast executives, including Florio and James Truman, of the first prototype for Sports for Women. A physical dummy magazine and some alternative covers with different titles were prepared and presented at the meeting. Sisman Dep., at 72–73. Sisman Design's contract expired on February 15, 1996 and according to Florio, it was not renewed because Conde Nast did not like the work Sisman Design had performed for them. Florio Dep., at 88.

In April 1996 Conde Nast hired Johan Svensson as Art Director of Sports for Women. Danziger, who did not know Svensson, hired him because of his work as an art director for Harper's Bazaar. Svensson's first task was to redesign the logo for the magazine title. Svensson Dep., at 35–37. Svensson's only direction in redesigning the logo was that the terms "Sports," "Conde Nast," and "For Women" should be prominent. *Id.* at 35–39.

After working all weekend shortly after being hired, one of the logos he designed was approved by Newhouse. *Id.* at 39–41, 45. A few days later, however, Svensson was instructed by Conde Nast's lawyers to change the logo which had been approved by Newhouse. Specifically, he was instructed to change the initial letters in each of the five words of the title, which were all in lower case lettering, to upper case lettering. He did so, and the re-designed logo was approved. *Id.* at 41, 53–54.

Svensson had no knowledge of Plaintiff's magazine at the time he was hired to design the Sports for Women logo. *Id.* at 17–22, 27–28, 31, 36–56. Svensson, however, later saw copies of the first, second and third issues of Sports Traveler Magazine around "the [Conde Nast] offices." *Id.* at 69–72. Svensson never had any conversations with anyone at Conde Nast about Sports Traveler Magazine. *Id.* at 72.

In June of 1996 a mailer was prepared for a test mail solicitation of subscribers. Included in that mailer were two prototype covers, one of which was also reproduced in an article appearing in the June 26, 1996 issue of The Wall Street Journal. *See* Compl., Exh. 9. The prototype cover in the Wall Street Journal article was designed by Svensson, although Svensson merely modified Sisman's cover design by substituting an old European sans serif typeface font for the lettering. Rosenthal Aff., Exh. 30, at 85–86, 118–119. Sisman had never seen Sports Traveler Magazine when she designed the logo and prototype covers, and Danziger had no input into Sisman's design. *Id.*, Exh. 35, at 37.

A single running woman is depicted on the Wall Street Journal prototype cover with her head obscuring parts of the "P" and the "O" of the word "Sports," which is positioned across the masthead. A second prototype cover, also displays a woman (this time boating) with her head also obscuring parts of "Sports," and was also included in the mailer. The phrase "Conde Nast" is positioned above the word "Sports," and the phrase "For Women" is positioned below the word "Sports." The Wall Street Journal article was the first time the picture of the prototype cover page of the magazine had been published.

Every page of the test mailer included at least one reference to "Conde Nast." Every reference to the title of the new magazine includes "Conde Nast" in a clearly readable size (either in the same proportion to the rest of the title as on the prototype cover or the same size as "Sports"). The outside of the envelope for the mailer states: "The new magazine from the publishers of Vogue, Glamour, Self, Conde Nast Traveler and Al-

lure," and features a prominent "Conde Nast." The Wall Street Journal article clearly identifies Conde Nast as the source of the new magazine and identifies Sports Traveler as one among several existing and proposed "rivals" of Conde Nast's new magazine. Perkins concedes that the words "Conde Nast" on the cover are visible from fifteen feet away. *See* Perkins Dep., at 75–76.

The cover changed in the late Summer or early Fall 1996, when Svensson made a presentation to James Truman of the Sports for Women logo. According to Svensson, Truman was not pleased with anything about the magazine. Svensson Dep., at 57–59. As a result, in or about October, 1996, Svensson contacted three outside freelancers to create a new logo for Sports for Women. Of the three contacted, only two actually performed services for Conde Nast. In early March, 1997 a logo designed by one of the freelancers, Jeffrey Keedy was selected and approved by Newhouse. *Id.* at 136–38. On March 10, 1997, however, Keedy was advised by Svensson that certain changes in the size of the lettering of the logo had to be made because of the "lawyers" and "a particular lawsuit." *Id.* at 138–141. After further revisions to the logo were made, which included making the words "Conde Nast" larger than either the designer, Keedy, or the art director, Svensson, would have liked, an acceptable logo design was finally agreed upon by Conde Nast in April 1997. *Id.* at 140–141. This final product does not differ substantially from the prototype cover in the Wall Street Journal article.

### C. The Instant Action

Plaintiff brought suit alleging that Conde Nast infringed its trade dress under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count I), and under common law (Count II). Sports Traveler also alleges common law unfair competition and misappropriation claims arising out of the alleged trade dress infringement (Count III). Count IV alleges that Conde Nast violated N.Y.Gen.Bus.Law § 349, but this count was dismissed by the Court. *See Sports Traveler, Inc. v. Advance Magazine Pubs., Inc.,* 96 Civ. 5150(JFK), *Order and Opinion,* Mar. 24, 1997. Count V alleges that Conde Nast's conduct amounts

to dilution as proscribed by N.Y.Gen.Bus. Law § 368–d. Conde Nast subsequently moved for summary judgment on the four extant claims.

### DISCUSSION

#### I. Summary Judgment Standards

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is also required "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *see also Silver v. City University of New York,* 947 F.2d 1021, 1022 (2d Cir.1991); *Living Music Records, Inc. v. Moss Music Group, Inc.,* 827 F.Supp. 974, 979 (S.D.N.Y.1993).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the movant is able to carry this initial burden, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a general issue for trial." Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the Court must "resolv[e] ambiguities and [draw] reasonable inferences against the moving party" in assessing whether there are any factual issues to be tried, *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), the non-moving party must produce "sufficient evidence favoring [it] for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The non-movant's "speculation, conclusory allegations and mere denials" are insufficient to defeat a

properly supported motion for summary judgment. *Greenblatt v. Prescription Plan Services Corp.,* 783 F.Supp. 814, 819–20 (S.D.N.Y.1992); *accord Knight,* 804 F.2d at 12 (non-moving party may not rely on mere speculation or conjecture to defeat summary judgment). The Court will decide the instant motion in accord with these principles.

## II. Counts I and II—The Trade Dress Infringement Claims

Conde Nast contends that summary judgment is appropriate for Counts I and II because Conde Nast has demonstrated that there are no material issues of fact, and Sports Traveler has not come forward with the requisite "specific facts" to disrupt this showing. Conde Nast argues that, as a matter of law, Sports Traveler Magazine's trade dress does not merit protection from the Lanham Act because: (1) the trade dress is not protectible; and (2) there is no likelihood of confusion between Sports Traveler Magazine's trade dress and Conde Nast's trade dress.

### A. The Lanham Act Claim

■ The Lanham Act prohibits any person from using "any word, term, name, symbol, or device, or any false designation of origin or any combination thereof, ... which ... is likely to cause confusion, or cause mistake, or to deceive ... as to the origin, sponsorship or approval of his or her goods." 15 U.S.C. § 1125(a)(1). The trade dress of a product includes the "design and appearance of the product ... and all elements making up the total visual image by which the product is presented to customers." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir.1995) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 764, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). Trade dress law does not "protect an idea, a concept or a generalized type of appearance" because trade dress law is intended to "protect an owner of a dress in informing the public of the source of its products, without permitting the owner to exclude competition from functionally similar products." *Id.* at 32–33.

■ The Supreme Court in *Two Pesos* established that to prevail in a trade dress infringement suit under the Lanham Act, the plaintiff must first prove that it has a protectible trade dress by showing (1) that the trade dress is itself inherently distinctive, or that (2) it has become distinctive by acquiring a secondary meaning. If the plaintiff has a protectible trade dress, then it must further show that a likelihood of confusion exists between its product and the defendant's product. *Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753. If, however, a defendant can establish that plaintiff's trade dress is functional, then the trade dress is not protectible regardless of distinctiveness or likelihood of confusion. *See, e.g., Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 169, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1005 (2d Cir.1995); *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 171 (2d Cir.1991).

### 1. Inherent Distinctiveness

The *Two Pesos* Court held that the test that applies to trademarks to determine whether the mark is inherently distinctive should also apply to trade dress. That test, first stated in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976), classifies trademarks for purposes of their protection in categories according to ascending degrees of inherent distinctiveness, namely "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or (5) fanciful." *Id.; see Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753. The Second Circuit has refined the *Two Pesos/Abercrombie* test by distinguishing between the trade dress of products themselves (product configuration cases), and the trade dress of the product's packaging (packaging cases). The Second Circuit has held that the *Abercrombie* analysis applies to packaging cases, but where the "trade dress is claimed in the configuration or design of the product itself ... the test for inherent distinction [is] whether the claimed dress is 'likely to serve as source designator.'" *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 378 (2d Cir.1997). It is important to understand that under this test, the product's dress, not the product's name, manufacturer, or concept, must be identifiable as the product's source.

The *Landscape Forms* court adopted this rule because it observed that the Second Circuit appeared to be moving toward a rule where the design or configuration of the product is usually not indicative of a product's source, and pointed out that the application of the Lanham Act "must be construed in the light of a strong federal policy in favor of vigorously competitive markets," a policy deemed consistent with both the *Abercrombie* analysis and the Second Circuit's product configuration test. *Id.* at 379–80. The instant dispute concerns a product design or configuration, thus in determining whether Sports Traveler Magazine's trade dress is inherently distinctive, the Court is guided by the *Landscape Forms* analysis.

### a. *Analysis*

■ In analyzing whether Sports Traveler Magazine's trade dress is capable of being a source identifier, the Second Circuit has directed district courts to evaluate the overall appearance of the trade dress, and not make its determination by focusing on the individual components of the trade dress. *See Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1069 (2d Cir.1995); *Jeffrey Milstein*, 58 F.3d at 32. Despite this mandate to focus on the overall appearance of the product, a plaintiff must still articulate the specific elements of the trade dress that render the trade dress unique or novel, that is, capable of being an identifier of the product's source. *See Landscape Forms*, 113 F.3d at 381. The articulation of specific, distinct elements is necessary because without such articulation, "courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market." *Id.* Therefore, although a court makes the source identifier determination based on the overall look of the trade dress, the court must still analyze each articulated element to arrive at its ultimate conclusion.

■ Sports Traveler articulates five allegedly distinct elements in its trade dress: (1) the trademark "Sports Traveler"; (2) the word "sports" boldly placed across the masthead in lower case helvetica (neue heavy extended) typeface and the word "traveler in smaller, upper case Caslon 540 font typeface underneath the word "sports"; (3) the logo display with the word "sports" emphasized over the word "traveler" in contrasting colors; (4) the layout of the typeface of the word "sports," which has been arranged so that the letters in the word "sports" slightly touch or blend into one another; and (5) a feminine, sports-oriented model depicted in an active setting. There is an absence of material fact concerning the makeup of Sports Traveler Magazine's trade dress. Based on these five articulated elements examined as they form Sports Traveler's overall trade dress, the Court concludes that Sports Traveler Magazine's trade dress is not capable of being a source indicator, and therefore Sports Traveler Magazine's trade dress is not inherently distinct.

■ The first element, the trademark "Sports Traveler" is irrelevant to the Court's determination because the mark is not part of Sports Traveler Magazine's trade dress. Although the appearance of the words that comprise the mark are elements of the trade dress, the words that comprise the mark itself are not. Sports Traveler's trademark is not even at issue in the instant action.

The fonts used for the words "sports" and "traveler" are not unique because the fonts used are available "off the shelf." *See* Rosenthal Aff., Exh. 30, at 118–20. Sports Traveler has not produced any evidence to dispute this assertion.

Sports Traveler's third enumerated feature of its trade dress is similarly not unique. Neither the word "sport" nor the word "traveler" is unique in the publishing industry. The word "traveler" is a generic word that is used as part of the titles of many publications. *See National Geographic Soc'y v. Conde Nast Pubs., Inc.*, 687 F.Supp. 106 (S.D.N.Y.1988). In fact, the *National Geographic* case involved two travel magazines titled "Traveler," and, therefore, displayed the word "traveler" across the top of the magazine's cover.

The examples of magazines that prominently display the word "sport" or "sports" across the magazine's masthead are numerous. For women's sports, the most pertinent example is Women's Sports + Fitness maga-

zine, which until 1988 was titled Women's Sports. This magazine clearly used the word "Sports" as the prominent word in its logo, displayed across the top of the cover. *See* Rosenthal Reply Aff., Ex. 60, at 9. The word "sports" however, does not denote either gender, and is frequently used in the titles and logos of magazines that cover sports in general, including women's sports, and which have featured women on their cover (*e.g.,* Sports Illustrated, Sport, Inside Sports). *See* Rosenthal Aff., Exhs. 21, 30. Of particular relevance are the various title formats used by Sports Illustrated over the years from 1955 to date as shown in the Editor's Letter to the recently published first issue of Sports Illustrated women/sport. *Id.* Exh. 26, at 8. "SPORTS" was broadcast across the top of the cover as the largest title element in 1955, became less prominent thereafter, but became more prominent in recent years because "ILLUSTRATED" is frequently obscured by the cover picture. *Id.*

The use of blending in the word "sports" is not unique either. Indeed, a sampling of the various magazine covers from different publications submitted in connection with the instant motion demonstrates that blending in the logo is generic in the industry. Magazines such as Sport (Rosenthal Reply Aff., Exhs. 54, 55), People (*Id.* Exh. 72), Sports Illustrated (*Id.* Exh. 62), Vogue and GQ (Rosenthal Aff., Exh. 36) all have used the blending technique for the logo on the cover of their magazine.

Sports Traveler attempts to end run these difficulties by arguing that the alleged uniqueness of the concept of Sports Traveler Magazine supplies the trade dress with the requisite distinctiveness. Sports Traveler claims that its product, a magazine devoted solely to women's sports (at both the participatory and spectator level), was the first of its kind and ahead of its time. Therefore, Sports Traveler argues that the elements of its magazine's trade dress that might be considered generic, specifically the use of the word "sports" prominently placed across the top of its cover and the use of a female model in an active setting, are in fact unique because of their association with Sports Traveler's Magazine.

Sports Traveler's argument fails because it relies on the uniqueness of the idea of a women's sports magazine and not the uniqueness of the trade dress of a specific embodiment of that idea. Uniqueness of an idea and not the trade dress itself is not a proper basis upon which a court can base a finding that a trade dress is capable of being a source identifier. The connection must be between the trade dress and the product, not the idea and the product. *See Jeffrey Milstein*, 58 F.3d at 32–33. In any event, it is not true that Sports Traveler Magazine was the first magazine to focus on women and sports. Women's Sports + Fitness has been published *since* 1974, and featured a cover image of females depicted in active settings as early as 1979, when the magazine was titled Women's Sports. Rosenthal Reply Aff., Exh. 60, at 9–10.

Sports Traveler concedes that it does not have the exclusive right to put a woman on the cover of a magazine, Perkins Dep., at 67–68, but Sports Traveler seems to contend that its use of a female model portrayed in an active setting on the cover of an allegedly unique magazine is unique. First, as demonstrated above, the key inquiry is whether the dress of the product, not the idea, is unique. Thus, it does not matter if Sports Traveler was a unique magazine at the time of publication, which it apparently was not. Instead, the inquiry is whether the use of a woman in an active setting on the cover of a magazine is unique. The answer is no. The best example is Women's Sports + Fitness, which predated Sports Traveler Magazine by over twenty years, and routinely used pictures of women in active poses or settings on its cover. Many sports magazines feature, from time to time, women in active setting on their cover. *See, e.g.,* Rosenthal Aff., Exhs. 21, 26.

Based on the above, the Court concludes that the overall trade dress of Sports Traveler Magazine's trade dress is quite generic and commonplace for the magazine publishing industry, and it is therefore incapable of serving as a source designator for Sports Traveler Magazine.

### 2. Secondary Meaning

The trade dress of a product attains secondary meaning if plaintiff estab-

lishes that the purchasing public associates the trade dress with goods from a single source rather than just the product itself. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *Time Inc. v. Globe Communications Corp.*, 712 F.Supp. 1103, 1107 (S.D.N.Y.1989). Secondary meaning in a trade dress exists when a consumer immediately associates the dress of the product with its source. *See Black & Decker Corp. v. Dunsford*, 944 F.Supp. 220, 226 (S.D.N.Y. 1996). Factors a court should consider in determining the existence of secondary meaning include: (1) plaintiff's advertising expenditures; (2) consumer surveys linking the trade dress to a particular source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the trade dress; (6) the length and exclusivity of the use. *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). No single factor is outcome determinative. In the instant case, the issue is whether Sports Traveler's trade dress had attained secondary meaning at the time Conde Nast publicly adopted the prototype cover, June 26, 1996. *See Black & Decker*, 944 F.Supp. at 227.

### a. Advertising Expenditures

Sports Traveler concedes that it had no advertising budget. Perkins Aff., ¶ 14. Sports Traveler instead claims that its promotional efforts should count as advertising expenditures in analyzing this factor, because these activities cost Sports Traveler money. Although Sports Traveler cites no authority for this position, the Court, for the purposes of this analysis, assumes that the promotional activities are advertising expenditures.

Sports Traveler argues that the effectiveness of the advertising, not the size of the expenditure, is the important factor in this analysis. *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987). Although the *First Brands* test is a correct statement of the law, it correctly points out that in *First Brands* the Ninth Circuit held that plaintiff's extensive advertising budget failed to establish secondary meaning in their product's (anti-freeze) trade

dress because the advertising campaign had not "stressed the color and shape" of the antifreeze jug at issue. Therefore, although the company expended a great deal in advertising, there was no secondary meaning established in the product's trade dress because the advertising did not focus on the trade dress. *Id.* Similarly, in the instant case, Sports Traveler has failed to produce any evidence that demonstrates that the focus of its promotional activities was on the magazine's trade dress. To the contrary, Sports Traveler repeatedly stresses that the key to Sports Traveler Magazine's success was the uniqueness of the idea. This factor favors Conde Nast.

### b. Consumer Studies

Sports Traveler did not conduct a consumer survey because it did not have the financial resources to do so. Although Sports Traveler concedes that consumer surveys have become the usual way of demonstrating secondary meaning, it claims that it should not be prejudiced because it did not conduct a survey especially because Conde Nast had the resources to conduct a survey and chose not too. Sports Traveler cites two cases to support the proposition that they should not be prejudiced because of failure to conduct the survey, but the Court finds that these cases do not support Sports Traveler's position. Sports Traveler has the burden of coming forward with probative evidence, and it has not done so on this factor. This factor favors Conde Nast.

### c. Unsolicited Media Coverage of the Product

Sports Traveler contends that the seventy-eight media references to Sports Traveler Magazine tilts this factor in favor of Sports Traveler. Sports Traveler, however, overstates the volume of media references that are relevant. First, any media reference after June 26, 1996, is irrelevant because that is the date upon which Sports Traveler's trade dress must have attained secondary meaning. Also, any reference that does not contain a picture of the magazine's cover is irrelevant, because it is the trade dress, not the magazine that is at issue. As of June 26, 1996, there were forty-four media references to Sports Traveler Magazine, and only five of

those references contained a picture of the cover of Sports Traveler Magazine. Of those forty-four references, only fourteen were in consumer publications, and only one of these fourteen showed the cover. The other four pertinent references were published in trade magazines, publications that the general population likely did not see. Thus, there is only one reference that the public will have seen that contains Sports Traveler Magazine's trade dress. This reference is the only pertinent one to this factor because in making the secondary meaning determination, the Court must analyze whether a consumer would link the trade dress to the product's source. The Court finds that this one media reference does not rise to a level sufficient to permit a jury to conclude that Sports Traveler Magazine's trade dress attained secondary meaning.

#### d. Sales Success

The sales figures of Sports Traveler Magazine as of June 26, 1996 do not rise to the level to support a finding that Sports Traveler's sales figures establish secondary meaning. As of June 26, 1996, Sports Traveler had sold only 60,340 copies of its magazines, and had procured at most 1485 subscriptions. Sports Traveler has cited no case where any court has held that secondary meaning can be established based on the minimal commercial activity of Sports Traveler Magazine. In fact, courts hold to the contrary. *See, e.g., Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 n. 1 (2d Cir.1981) (holding that 20,000,000 "Harlequin Presents" books sold in United States in 1979 led to finding of secondary meaning); *Roselux Chem. Co. v. Parsons Ammonia Co.*, 49 C.C.P.A. 931, 299 F.2d 855, 862 (C.C.P.A. 1962) (Holding that $3,000,000 in sales in one year was insufficient to establish secondary meaning); *Arrow Fastener Co. v. Stanley Works*, 870 F.Supp. 427, 428 (D.Conn.1994), *rev'd on other grounds*, 59 F.3d 384 (2d Cir.1995) (holding that sales of 40,000,000 staplers and over 500,000,000 boxes of staples led to finding of secondary meaning); *Time Inc.*, 712 F.Supp. at 1108 (holding that sales of over $1,000,000,000 and over 1,000,-000,000 copies of magazines over an eight year period justified finding of secondary meaning of trade dress); *Sunrise Home*

*Juices, Inc. v. Coca-Cola Co.*, 220 F.Supp. 558, 561 (S.D.N.Y.1963) (classifying sales that had grown from $30,000 a year in 1952 to $600,000 a year in 1963 as "comparatively limited" and holding that such sales were insufficient to show secondary meaning).

#### e. Attempts to Plagiarize the Trade Dress

Sports Traveler argues that it has produced sufficient evidence to create a material issue of fact concerning whether Conde Nast copied Sport Travelers Magazine's trade dress. Sports Traveler bases this argument on: (1) Danziger had been involved with Sports Traveler before her employment at Conde Nast, and she was privy to Sports Traveler's early prototype boards; (2) executives at Conde Nast met multiple times with Perkins to discuss Conde Nast's possible acquisition of Sports Traveler; and (3) there were copies of Sports Traveler Magazine around the Conde Nast offices and many employees, including Danziger and Svensson, saw copies of Sports Traveler Magazine. Plaintiff argues that these facts create "an odor of bad faith [that] makes it clear that Conde Nast deliberately copied the trade dress" of Sports Traveler Magazine. Pl's Mem. in Opp. to Def's Mot. for Summ. J., at 12.

The Court concludes that Sports Traveler has not met its burden of coming forth with specific facts to demonstrate an issue of material fact regarding the alleged copying and bad faith of Conde Nast. In fact, the record is devoid of any proof of copying or bad faith by Conde Nast. Sports Traveler's arguments are speculative assertions that cannot raise any genuine issues of fact.

The essence of Sports Traveler's claims is that there is a question of fact concerning Conde Nast's good faith in creating the Sports for Women cover because certain people associated with Conde Nast had access to Sports Traveler Magazine's trade dress before Sports for Women created its cover. Danziger had access during her discussions with Perkins when Danziger was considering employment at Sports Traveler. The executives that discussed the possible acquisition of Sports Traveler Magazine had access to Perkin's ideas during the meetings they had

with Perkins. Mere access to Sports Traveler Magazine's trade dress, however, does not give rise to an inference that Conde Nast acted in bad faith by copying Sports Traveler Magazine's trade dress.

Furthermore, there is nothing in the record to infer that the two people who created the cover for Sports for Women, Lucy Sisman and Johan Svensson, copied Sports Traveler Magazine's trade dress. Sisman personally designed the initial Sports for Women prototype covers. Sisman had not seen any issue of Sports Traveler Magazine during the course of her design work for Sports for Women and there is no proof that Danziger had any input into her work. Clearly, Sisman could not have copied Sports Traveler Magazine's trade dress.

In April 1996, Svensson took over for Sisman, and made some small refinements to Sisman's design. This design was used by Conde Nast in the Wall Street Journal article, and is basically the same as the design created by Sisman. Although Svensson saw copies of Sports Traveler Magazine, it is unclear when he saw the magazines. Even if he saw the magazines before he refined Sisman's design, there is no proof that he copied the trade dress. In fact, Svensson never talked to anyone at Conde Nast about Sports Traveler Magazine. Mere exposure to the cover of Sports Traveler Magazine is insufficient to create an issue of fact concerning Conde Nast's copying or bad faith.

Furthermore, the record demonstrates that Conde Nast acted in good faith to avoid copying Sports Traveler Magazine's trade dress. Conde Nast made a conscious effort to distinguish Sports for Women from Sports Traveler Magazine. Conde Nast made sure that the "Conde Nast" house name was prominently displayed on the materials developed in connection with the creation of Sports for Women. The cover for Sports for Women prominently displays the Conde Nast house name as an integral part of the title. Even Perkins concedes that in the prototype, the Conde Nast house name is visible at between ten and fifteen feet. The Conde Nast brand name is emblazoned on many parts of the mailer Conde Nast issued in connection with its subscription drive.

Conde Nast also employed the assistance of attorneys in designing the trade dress for Sports for Women, a fact that supports an inference of good faith. *See Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 583 (2d Cir.1991) (stating that "request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith"). Conde Nast had its attorneys conduct at least two trademark searches in connection with designing the cover of Sports for Women. The trade dress of Sports for Women was twice modified in reliance on advice from Conde Nast's counsel. The Court finds that these efforts taken by Conde Nast establish that Conde Nast acted in good faith in designing the trade dress for Sports for Women.

*f. Length and Exclusivity*

Sports Traveler Magazine was on the market for about nine months when the June 26, 1996 Wall Street Journal article was published, and only three issues had been published. The Court holds that these figures are too limited in duration and quantity to find that secondary meaning had attached to Sport Traveler Magazine's trade dress.

*3. Functionality Defense and Likelihood of Confusion*

Based on the Court's holding that Sports Traveler does not have a protectible trade dress, summary judgment in favor of Conde Nast is appropriate on Count I. There is, therefore, no need for the court to decide whether Sports Traveler Magazine's trade dress is functional, or whether there is a likelihood of confusion between Sports Traveler Magazine's trade dress and Sports for Women's trade dress.

*B. Common Law Trade Dress Infringement Claim*

■ The analysis for trade dress infringement is the same under both the Lanham Act and New York State common law. Specifically, the tests for inherent distinctiveness and secondary meaning apply to both federal statutory and common law trade dress infringement claims. *See Black & Decker,* 944 F.Supp. at 228 (citing *Pirone v. MacMillan Inc.,* 894 F.2d 579, 582 (2d Cir.

1990)). Therefore, Sports Traveler Magazine's trade dress is not protectible under common law, and there is no basis to assert a claim for common law trade dress infringement. Summary judgment is granted in favor of Conde Nast as to Count II of the Complaint.

### III. Count III—Unfair Competition Claim

 Essential to a claim of unfair competition and misappropriation under New York common law, is "the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or deceive purchasers as to the origin of the goods." *Rosenfeld v. W .B. Saunders,* 728 F.Supp. 236, 249–50 (S.D.N.Y.), *aff'd,* 923 F.2d 845 (2d Cir.1990). Therefore, a plaintiff must establish that defendant, in bad faith, misappropriated its "labors and expenditures." Based on the Court's finding that Conde Nast did not plagiarize or copy Sports Traveler Magazine's trade dress, or act in bad faith, there is no basis for Sports Traveler's unfair competition and misappropriation claim. *See* Discussion, *supra,* part II.A.2.e. Therefore, summary judgment is granted in Conde Nast's favor as to Count III of the Complaint.

### IV. Count V—Dilution Claim

To sustain a claim for dilution of a trade dress under New York Gen.Bus.Law § 368–d, it is necessary for a plaintiff to establish that its trade dress is inherently distinctive or has acquired secondary meaning. *See, e.g., Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 506 (2d Cir.1996); *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983); *Philip Morris, Inc. v. Star Tobacco Corp.,* 879 F.Supp. 379, 389 (S.D.N.Y.1995). The Court has determined that Sports Traveler Magazine's trade dress is not entitled to protection under the Lanham Act because it is neither inherently distinctive nor has it acquired secondary meaning. Therefore, Sports Traveler's claim for dilution must similarly fail as a matter of law. Summary judgment is granted in Conde Nast's favor as to Count V of the Complaint.

### CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted, and Plaintiff's complaint is hereby dismissed. The Court orders this case closed, and directs the Clerk of the court to remove it from the Court's active docket.

**SO ORDERED.**