**BEST CELLARS, INC., Plaintiff,**

v.

**WINE MADE SIMPLE, INC., LJG Wines, Inc., Brigitte Baker, William Baker, and Lisa Grossman, Defendants.**

No. 01 Civ. 11780(GEL).

United States District Court, S.D. New York.

March 14, 2003.

Gerald B. Lefcourt, New York City
(Sheryl E. Reich on the brief), and Leon

Friedman, New York City, for plaintiff Best Cellars, Inc.

Thomas A. Smart, Kaye Scholer LLP, New York City (Michael A. Rogoff, Paul C. Llewellyn, on the brief), for defendants Wine Made Simple, Inc., LJG Wines, Inc., Brigitte Baker, William Baker, and Lisa Grossman.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Best Cellars, Inc., owns and operates retail wine stores, as do the defendants. Best Cellars claims in this action that its stores use a distinctive trade dress protected by law, and that the wine shops operated by defendants are so similar to plaintiff's that they infringe upon the protections provided to Best Cellars (1) against trademark infringement, trade dress infringement and false designation of origin pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) against trademark dilution under the Trademark Dilution Act, 15 U.S.C. § 1125(c); and (3) against unfair competition under the laws of the States of New York, California, Arizona, Colorado and Idaho.

Best Cellars seeks injunctive relief, as well as compensatory and punitive damages, against defendants Wine Made Simple, Inc., its principals Brigitte Baker and William Baker, its New York licensee LJG Wines, Inc., and LJG's principal Lisa Grossman (collectively "defendants"). The parties have cross-moved for summary judgment. For the reasons explained below, because there are genuine disputes about issues of material fact particularly concerning the likelihood of confusion, plaintiff's motion will be denied, and defendants' motion will be granted in part and denied in part.

## BACKGROUND

The following facts are taken from the voluminous record submitted by the parties on their respective motions. As might be suspected from the submission of approximately two feet of exhibits, affidavits, and briefs, including statements of allegedly undisputed material facts that have been followed by counter-statements and reply statements of allegedly undisputed facts, the parties are not in agreement about many issues of fact, inference and characterization. The following statement attempts to state as fact only what is truly undisputed, identifying significant disputes and indicating evidentiary sources for most of the Court's statements. Given the procedural posture of the case, the following do not constitute findings of fact; rather, the Court is attempting only to outline the nature and history of the dispute, as a context for resolution of the legal issues at hand.

### Development of Best Cellars

Plaintiff Best Cellars owns and operates four wine stores, including its flagship store on the Upper East Side of Manhattan, which pursue the novel marketing strategy of organizing wines by taste category rather than by grape type or country of origin. The flagship store has a clean, crisp, modern decor that demonstrates that the owners invested energy and capital in the design of the store as well as in the development of the marketing theme. Best Cellars opened its flagship store in November 1996. The store's genesis dates from some time earlier when Joshua Wesson, a wine expert and author, began developing the idea of "a totally new kind of retail store for wine" intended to simplify the wine shopping experience for the novice wine consumer. (Aff. of Joshua Wesson, dated July 21, 2002 ("Wesson Aff.") at ¶¶ 21–22.) In 1995, Wesson joined forces with other industry professionals Michael

Green, the managing director of a New York wine store, and Richard Marmet, a corporate lawyer affiliated with *Food & Wine* magazine. (Pl.'s Mem. Supp. Summ. J. at 5.) After developing the concept of a store that retails wine by taste (such as light, medium or heavy-bodied white or red wines, sparkling and dessert wines), the three men selected an architectural firm and graphic design firm to create the interior decor for the store. (*Id.* at 5–6.) The interior design included wine racks built into a wall, which consist of tubes to hold bottles of wine horizontally, creating the appearance of a grid of steel rimmed holes in a light wood-paneled wall. The graphic design elements include computer-generated icons and brightly colored signs associated with each taste category.

Development of the prototype design for the store took twelve months. (*Id.* at 3.) The end result was dubbed "Best Cellars," and consisted of a store that stocks a limited selection of wines, retailing for under 20 dollars a bottle, sorted by taste and displayed in a what has been called a "wall of wine." Specialty wine and architectural magazines described the store as "a different kind of wine store" and "radically new" (*id.* at 9, citing the magazines *Wine & Spirits* and *Interiors*), and the store has been described in more general-subject publications as "revolutioniz[ing] wine shopping" and as offering "the most original approach to selling wine" (*id.*, citing the New York *Daily News* and *Time Out New York* magazine). Plaintiff now also has stores in Brookline and Boston, Massachusetts, Washington, D.C., and Seattle, Washington, and licenses its trade dress to a store in Great Barrington, Massachusetts. (Pl.'s R. 56.1 Counter–Statement at ¶ 75; Def.'s Reply to Pl.'s R. 56.1 Counter–Statement at ¶ 75.)

### Best Cellars Defends Its Trade Dress

As is common in a free market economy, competitors were quick to imitate plain-tiff's successful design and marketing strategy, and plaintiff sought the protection of intellectual property law to protect its legitimate interest in the trade dress it had developed. In 2000, after showing likelihood of success on its claims of trade dress and copyright infringement, Best Cellars won a preliminary injunction against a competitor who had blatantly imitated its trade dress. *Best Cellars, Inc. v. Grape Finds at Dupont, Inc.,* 90 F.Supp.2d 431, 458, 460 (S.D.N.Y.2000). In that action, Best Cellars identified four-teen specific elements which it "believe[d] constitute[d] the uniqueness of its trade dress," including the eight taste categories, the dominant building materials, the de-sign of the wine racks, the lighting design, the point-of-sale cards and the signage and graphic designs used in the store. *Id.* at 452. The Court in *Grape Finds* concluded that the "essence of the look ... is the 'wall of wine,' i.e., the color-coded, icono-graphic wall signs identifying the eight taste categories above single display bot-tles on stainless-steel wire pedestals which run along the store perimeter, above iden-tical color-coded vertical arrays of nine glowing bottles stacked horizontally, above a strip of cabinets or drawers which ex-tend to the floor." *Id.* at 452. Plaintiff seems to rely on those elements in this action as well, listing them in the section of its brief entitled "The Distinctiveness of Best Cellars" without suggesting that any of those features have changed or are no longer relevant. (Pl.'s Mem. Supp. Summ. J. at 8–10.)

### Advent of Bacchus

In December 1998, defendants Brigitte and William Baker opened a wine store in Manhattan Beach, California, called "Bac-chus." (Def.'s Mem. Supp. Summ. J. at 3.) Subsequently, their company, Wine Made Simple, licensed additional Bacchus stores

in Scottsdale, Arizona, Boulder, Colorado, and Ketchum, Idaho. (*Id.* at 12.) In November 2001, their licensee LJG Wines and its owner, Lisa Grossman, opened a Bacchus store on the Upper West Side of Manhattan (*id.*), less than two miles (but in a distinctly different neighborhood, on the other side of Central Park) from the flagship Best Cellars store. Like Best Cellars, Bacchus aims to sell wine to novice wine consumers by organizing the store's inventory by taste category, and by retailing modestly-priced wines in an imaginatively-decorated store. The Bacchus stores have a Mediterranean-themed decor consisting of white stucco and dark wood beams, and display wine bottles horizontally in racks which are constructed to resemble a grid of holes in a white stucco wall. (*Id.*)

### Genesis of Bacchus

According to its creators, the development of the Bacchus store idea was more informal and less professional than the development of Best Cellars. Defendants Brigitte and Michael Baker, who have professional experience in retail and construction but no professional experience in wine, discussed the idea of opening a wine store for novice wine consumers like themselves in the summer of 1998. (Pl.'s Mem. Supp. Summ. J. at 12–14; Def.'s Mem. Supp. Summ. J. at 4–6.) They discussed the idea with other California acquaintances that summer, including an employee of a wine distributor and a contractor, and researched wine tasting books as well as interior design publications. Ms. Baker claims to have developed the idea of marketing wine using eight taste categories through consultation with these sources, and her contractor designed and built the wine racks for the store consisting of white stucco-covered racks that held bottles horizontally, which created the appearance of a grid of regularly-spaced holes in a stucco wall. Ms. Baker also decided to associate colors with each of the eight taste categories, and chose the colors on a trip to a home improvement center. The signage for the interior of the store consists of aged metal, and the only graphic image is a painting of the Roman wine god Bacchus. Less than half a year after the origin of the Bacchus idea, its flagship store opened in the Manhattan Beach area of Los Angeles.

### Best Cellars Claims that Bacchus Violates its Trade Dress

Plaintiff claims that the Bacchus stores are confusingly similar to the Best Cellars stores, and that defendants are infringing plaintiff's legitimate intellectual property rights in the trade dress of the Best Cellars stores. Plaintiff additionally claims that defendants copied Best Cellars' trade dress, asserting that "[t]he similarity in the look and feel of the Bacchus stores to Best Cellars is such that it cannot be an accident." (Pl.'s R. 56.1 Counter–Statement ¶ 2.) Defendants respond that they did not copy the Best Cellars store, that they were unaware of the Best Cellars stores when they developed the marketing strategy and interior design for Bacchus, and that plaintiff has not presented evidence demonstrating that "defendants had ever seen or heard of Best Cellars or copied any aspect of Best Cellar's purported trade dress." (Def.'s Rep. to Pl.'s R. 56.1 Counter–Statement ¶ 2.) Plaintiff claims, in essence, that fundamental elements of the marketing idea and trade dress that took wine industry professionals over a year to develop could not possibly have been independently devised by wine neophytes in less than half that time.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material

fact in dispute and when, viewing the evidence in a light most favorable to the nonmoving party, no reasonable trier of fact could disagree as to the outcome of the case. *See Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir.2000). While all ambiguities in the evidentiary record must be resolved in favor of the nonmoving party, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). In addition, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the party opposing summary judgment " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto*, 143 F.3d at 114 (quoting *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

## II. *Trade Dress Infringement*

■ The principal claim in the complaint charges trade dress infringement under the Lanham Act. Trade dress "encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997), citing *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir.1995). *See also Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (trade dress "constitutes a 'symbol' or 'device' for purposes of" Lanham Act § 43(a)"). The legal principles governing the protection of unregistered trade dress are very similar to the principles governing other registered and unregistered marks. *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir.2001). Section 43(a) of the Lanham Act protects such trade dress by creating a cause of action against

[Any] person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or

approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1).

The text of the statute makes clear that the Lanham Act is not intended to enable monopolistic use of a commercial idea, but rather aims to guard against confusion in the marketplace that would harm both buyers and sellers. Indeed, this Circuit has advised district courts that "[w]hen evaluating [trade dress] claims, courts must not lose sight of the underlying purpose of the Lanham Act, which is protecting consumers and manufacturers from deceptive representations of affiliation and origin." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 375 (2d Cir.1997). Furthermore, "the Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets." *Id.* at 379.

■■■ While the Lanham Act protects the "overall image or appearance" created by a product's design or packaging, the plaintiff must precisely articulate the specific elements that comprise its distinct trade dress, so that courts can evaluate claims of infringement and fashion relief that is appropriately tailored to the distinctive combination of elements that merit protection. *See Landscape Forms,* 113 F.3d at 381 (plaintiffs must provide "a precise expression of the character and scope of the claimed trade dress"). This articulation requirement also helps to ensure that claims of trade dress infringement are pitched at an appropriate level of generality, for "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Jeffrey Milstein,* 58 F.3d at 32.

## A. *Distinctiveness of Best Cellars' Trade Dress*

■■■ The standard for assessing the "distinctiveness" of a product's trade dress depends on the type of trade dress for which protection is sought. The trade dress category has grown to include not simply the literal "dressing" or "packaging" of a product, but also in some instances the design or configuration of the product itself. To establish a claim for product packaging trade dress infringement under Lanham Act § 43(a), the plaintiff must demonstrate (1) "that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning, [although] an otherwise inherently distinctive trade dress is entitled to protection only if it is also nonfunctional" and (2) "that there is a likelihood of confusion between defendant's trade dress and plaintiff's." *Fun–Damental Too,* 111 F.3d at 999, citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769–70, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). *See* 15 U.S.C. § 1125(a)(3). In contrast, trade dress based on product design "is not inherently distinctive," since "almost invariably even the most unusual of product designs ... is intended not to identify the source, but to render the product itself more useful or more appealing," or in sum, for "purposes other than source identification." In product design trade dress cases, therefore, the plaintiff must show (1) that its trade dress has "acquired" distinctiveness in the form of "secondary meaning" and (2) the likelihood of confusion. *See id.*

Unlike more traditional trade dress cases that concern product packaging (like water bottles, *see Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 269 F.3d 114 (2d Cir.2001)) or product designs (like children's clothing, *see Samara Bros.,* 529 U.S. at 213, 120 S.Ct. 1339), this case

concerns the interior decor of a retail establishment where customers purchase other products. In this, the case is similar to *Two Pesos,* which concerned the interior decor of Mexican-themed restaurants. *See Two Pesos,* 505 U.S. at 764–65 n. 1, 112 S.Ct. 2753 (noting that trade dress "may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques" (citations and internal quotation marks omitted)). As the Supreme Court explained, the interior decor category fits awkwardly into the classifications of trade dress law, constituting either product packaging or a *"tertium quid"* akin to product packaging. *Samara Bros.,* 529 U.S. at 215, 120 S.Ct. 1339. Interior decor is thus clearly *not* product design. Accordingly, it is appropriate to analyze the Best Cellars' interior decor trade dress under the product packaging standard for inherent distinctiveness set forth in this Circuit by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). Indeed, in a case similar to this one, Judge Sweet found on a motion for a preliminary injunction that Best Cellars' trade dress is inherently distinctive under the *Abercrombie* test and thus protectable. *See Best Cellars, Inc. v. Grape Finds at Dupont, Inc.,* 90 F.Supp.2d 431, 451–52 (S.D.N.Y. 2000). For the reasons set forth below, this Court agrees with that conclusion based on the facts presented in this case.

The trade dress for which Best Cellars claims protection is the total effect of the interior design of its store, which it describes as: (1) eight words differentiating taste categories; (2) eight colors differentiating taste categories; (3) eight computer manipulated images differentiating taste categories; (4) taste categories set above display fixtures by order of weight; (5) single display bottles set on stainless-steel wire pedestals; (6) square $4'' \times 4''$ cards with verbal descriptions of each wine ("shelf talkers") with text arranged by template; (7) shelf talkers positioned at eye level, below each display bottle; (8) bottles vertically aligned in rows of nine; (9) storage cabinets located beneath vertically aligned bottled; (10) materials palette consisting of light wood and stainless steel; (11) mixture of vertical racks and open shelving display fixtures; (12) no fixed aisles; (13) bottles down and back-lit; and (14) limited selection (approximately 100) of relatively inexpensive wine. (Pl.'s Mem. Supp. Summ. J. at 8.) Defendants contend that certain of these elements are functional (such as arranging wines by taste category, color coding categories, presenting categories under a sign, posting index-card descriptions of each wine, stocking a limited number of wines, storing wine in cabinets beneath wine racks and the absence of fixed aisles) (Def.'s Mem. Supp. Summ. J. at 23–25), and that other elements are of such widespread use in wine stores that they are generic (such as storing wine bottles horizontally in racks, using a single bottle on display, and placing informational point-of-sale cards at a uniform height) (*id.* at 25–26). In sum, the defendants claim that the plaintiff's trade dress is not entitled to trade dress protection as a matter of law. (*Id.* at 22.)

■ Under the *Abercrombie* test, trade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection. A descriptive trade dress may be found inherently distinctive if the plaintiff establishes that its mark has acquired secondary meaning giving it distinctiveness to the consumer. A generic trade dress receives no Lanham Act protection.

*Fun–Damental Too,* 111 F.3d at 1000 (*citing Two Pesos,* 505 U.S. at 768–69, 112 S.Ct. 2753). While it is important that the party claiming protection articulate with specificity the elements comprising its trade dress for purposes of the distinctiveness inquiry, as Best Cellars has done here, *see Kaufman & Fisher Wish Co., Ltd. v. F.A.O. Schwarz,* 184 F.Supp.2d 311, 317 (S.D.N.Y.2001), it would be analytically unsound to parse each individual element to determine where it falls on the *Abercrombie* spectrum. Rather, "although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry. Thus, if the overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of generic [or functional] elements." *Jeffrey Milstein,* 58 F.3d at 32. Because in the context of trade dress the whole can be greater than, or at least different from, the sum of its parts, it is necessary to consider the combined articulated elements of Best Cellars' trade dress to determine whether as an ensemble they form a distinctive presentation to consumers.

Based on the evidence presented to the Court on the cross-motions for summary judgment, and resolving any factual ambiguities in favor of defendants, it is clear that plaintiff has a protectable interior decor trade dress. While certain articulated elements are well-designed and thus "functional" for the purpose of retail wine sales, such as posting point-of-sale cards at a height where they can be easily read by the average height shopper, or storing wines in a cabinet positioned so low on a wall that using that space for display would be impractical, that does not mean that those elements are to be excluded from a specifically articulated trade dress. By the same logic, simply because certain elements are used in other wine shops,

such as storing wine horizontally in racks or presenting one display bottle per wine does not mean that those elements must be removed from the overall impression because they are "generic."

While there may be a certain ergonomic or marketing logic to certain elements of the decor, defendants have not met their burden of showing that those elements are "functional" in that they are "essential to effective competition in a particular market," *Landscape Forms,* 70 F.3d at 253, or "essential to the use or purpose of the article" (in this case, the store), *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)).

Best Cellars, on the other hand, has met its burden of establishing the inherent distinctiveness of its trade dress taken as a whole because the elements, as combined, make up a distinct and arbitrary total visual image to consumers. Defendants in fact do not seriously dispute that there is a distinctive look to Best Cellars. They do not describe Best Cellars as a generic, unremarkable retail shop; rather, they echo some of plaintiff's descriptions of the decor as quite specific, for example, by describing the Best Cellars stores as exhibiting a clean, crisp modern design characterized by wood and steel. (Def.'s Mem. Supp. Summ. J. at 12–13.) It is thus essentially undisputed that certain elements of the Best Cellars trade dress are arbitrary and/or uncommon for wine shops, such as the use of wood and steel, and the law does not require that every element of trade dress be arbitrary. *See Jeffrey Milstein,* 58 F.3d at 32.

The *Grape Finds* decision intentionally does not comment on precisely which of the 14 factors enumerated by plaintiff com-

prise the Best Cellars trade dress, and instead describes what the court found to be

> the essence of the look [consisting of] color-coded, iconographic wall signs identifying eight taste categories above the single display bottles on stainless-steel wire pedestals which run along the store perimeter, above identical color-coded textually formatted square shelf-talkers, above vertical arrays of nine glowing bottles stacked horizontally, above a strip of cabinets or drawers which extend to the floor.

90 F.Supp.2d at 452. It is the combination of elements that defines the protectable trade dress, because it is the combination that a customer would perceive upon entering the store. This emphasis on the ensemble effect cuts both ways for the plaintiff in this case, as indeed it does for any plaintiff in a trade dress infringement case. Because of the vast array of permutations of elements available to sellers to create their specific trade dress, "a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection." *Fun–Damental Too*, 111 F.3d at 1000. However, as the *Grape Finds* court noted, while the emphasis on specific combinations and total visual impact makes it relatively easy for a plaintiff to meet the inherent distinctiveness aspect of the trade dress infringement test, the same emphasis makes it correspondingly difficult for a plaintiff to prove likelihood of confusion. *See id.* at 451 n. 11. That is because defendant-competitors who have some similar elements as well as noteworthy dissimilar elements in their trade dress may be able to show that the specific combination of elements that *they* use also constitutes protectable trade dress, and that consumers are unlikely to confuse the two products, or in this case, the two stores.

In describing its own distinctive trade dress, Best Cellars frequently slides between different theories, perhaps attempting (consciously or otherwise) to evade this dilemma. Thus, plaintiff's strongest (and controlling) argument for distinctiveness incorporates all fourteen of the features discussed above in describing the total overall look of the wine shop, and Best Cellars adopts this approach in arguing that its trade dress is distinctive. (Pl.'s Mem. Supp. Summ. J. at 22, 24; Pl.'s Mem. Opp. Summ. J. at 11.) But when emphasizing the publicity and praise it has received for its design, or arguing that defendants have infringed their trade dress, plaintiff frequently speaks as if the "wall of wine" alone (Pl.'s Mem. Opp. Summ. J. at 15; Pl.'s Reply Mem. Supp. Summ. J. at 3–4), or even the general "revolutionary" concept of selling wines by taste (Pl.'s Mem. Supp. Summ. J. at 9), constitutes the trade dress it claims was appropriated by defendants. This will not do; the trade dress is the overall look of the store, consisting of a cumulation of interacting elements, and defendants do not infringe by appropriating the marketing concept, or any particular element of plaintiff's design, unless the overall dress is sufficiently similar to generate likely consumer confusion. *See Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*, 25 F.Supp.2d 154, 163 (S.D.N.Y.1998) (citing *Jeffrey Milstein*, 58 F.3d at 32–33, for the proposition that uniqueness of a concept is not protected trade dress).

It is thus worth noting that while some elements of Best Cellars' trade dress are related to the marketing theme of selling wine by taste, those elements are not dispositive. While categorization of wine by taste is relevant to plaintiff's trade dress to the extent it impacts the store's interior design, that element standing alone is not protected, and plaintiff cannot prevent other sellers from categorizing wine by taste

either in their general marketing scheme or in their interior design. For this reason, when Judge Sweet granted the preliminary injunction against the defendant in *Grape Finds*, he nevertheless permitted the defendant in that case to continue organizing wine into eight taste categories in its store. *See* 90 F.Supp.2d at 458.

 Under the *Two Pesos* rule, if a trade dress is found to be inherently distinctive, it is not necessary to prove secondary meaning. *See* 505 U.S. at 776, 112 S.Ct. 2753. Because Best Cellars' interior decor is inherently distinctive and thus protectable trade dress, it is not necessary to consider the question of secondary meaning. Therefore, the next stage of the analysis is to determine whether reasonable minds could disagree about whether there is a probability of consumer confusion.

### B. *Likelihood of Confusion*

 Under the law of this Circuit, "likelihood of confusion means a probability of confusion; 'it is not sufficient if confusion is merely possible.'" *Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997), *quoting* 3 J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:2 at 23–10 to 11 (1996). The likelihood of consumer confusion is determined by considering the eight non-exhaustive factors originally elaborated in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.1961):(1) the strength of the plaintiff's mark; (2) the degree of similarity between the marks; (3) the proximity of the products; (4) the likelihood that the plaintiff will bridge the gap between the two products; (5) actual

confusion of customers in the relevant market; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendants' product; and (8) the sophistication of the buyers. *See Nora*, 269 F.3d at 119, (noting that the *Polaroid* test is not a mechanical test). The Court must "focus on the ultimate question of whether consumers are likely to be confused," and while no single factor is *necessarily* dispositive, "any one factor may prove to be so." *Id.*

 "Questions regarding likelihood of confusion are normally factual in nature," given the complexity of the test and the likelihood of material factual disputes about a number of the factors. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 116 (2d Cir.1984). Summary judgment is nevertheless "appropriate if the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Id.; see also Warner–Lambert Co.*, 220 F.3d at 46 (noting that "in an appropriate case, the 'similarity of the marks' factor can be dispositive and will warrant summary judgment for an infringement defendant if . . . [the] marks are so dissimilar that no question of fact is presented" (internal quotation marks omitted)); *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 141 (2d Cir.1991) (affirming summary judgment where marks "are so materially different that no question of fact was presented on the issue of likelihood of their confusion").[1] The Court may visually compare the marks in order to determine whether any material question of fact exists as to their similarity. *See Resource Developers*, 926

---

1. Summary judgments for plaintiffs appear in the cases less frequently, presumably because motions for preliminary injunctions serve as the functional equivalent in cases in which the similarity of the marks or other factors make the likelihood of confusion overwhelmingly clear. *See, e.g., Fun–Damental Too*, 111 F.3d at 1007; *Grape Finds*, 90 F.Supp.2d at 461.

F.2d at 141; *Universal City Studios,* 746 F.2d at 116.

▮ The Court's task in this case is to determine whether any reasonable trier of fact could conclude that confusion is likely, and if so whether no reasonable trier of fact could conclude that confusion is not likely. As Judge Sweet put it in *Grape Finds,* "the inquiry can be put as follows: is there a substantial likelihood that an ordinarily prudent consumer would, when standing in the [defendant's] store, think he was standing in a Best Cellars store?" 90 F.Supp.2d at 454. Each *Polaroid* factor is examined in turn to determine whether the parties' factual presentations raise genuine issues of fact, noting that "if a factual inference must be drawn to arrive at a particular conclusion on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 478 (2d Cir.1996).

1. Strength of Mark

▮ The strength of a mark (or here, trade dress) is its "measured by its distinctiveness or the degree to which it indicates the source or origin of the product, [and should be] examined in its commercial context." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033 (2d Cir.1992). In this case, the trade dress at issue is the interior decor of the store, not simply the marketing theme of selling wine by taste. While this Court found in the preceding section that plaintiff's mark is inherently distinctive, that is not the end of the strength of mark inquiry, because "although the category on which the mark qualifies is useful in determining strength, it is not dispositive: 'the strength of a mark depends ultimately on its origin-indicating' quality in the eyes of the purchasing public." *Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486 (2d Cir.1988) *quoting McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir. 1979).[2]

Plaintiff has demonstrated that its interior decor has been covered in the design and architecture trade press, and in the wine press, and the evidence shows that plaintiff has won numerous design industry awards for its graphic design. (Pl.'s Mem. Supp. Summ. J. at 6–9; Def.'s Mem. Opp. Summ. J. at 4.) However, the wine-consuming public (and presumably, especially those consumers in the market for the relatively inexpensive wines in which both plaintiff and defendants primarily deal) is both broader than and distinct from the interior design and architectural professionals or readers of specialized wine journals who have been exposed to this publicity, and the evidence does not clearly demonstrate that the general consuming public tends to identify the specific interior decor with a particular store. Plaintiff has not produced marketing studies or advertising campaigns demonstrating that the store's decor is a focal point of consumer identification. In contrast, the publicity in the general media that plaintiff has received appears to focus on, and identify Best Cellars with, the unprotectable marketing theme of selling wine by taste

---

**2.** *McGregor–Doniger* was overruled as to the standard of review applicable to the factual aspects of the *Polaroid* test by *Bristol–Myers Squibb,* 973 F.2d at 1043–44, because the standard of review was amended by Rule 51 of the Federal Rules of Civil Procedure in 1985, but that development does not affect the principle concerning the strength of the mark. *See Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 139 at n. 3 (2d Cir.1999) for the continuing validity of other aspects of the analysis in *McGregor–Doniger.*

category rather than the overall physical design of the stores. *See* Wesson Aff. Ex. 21.[3] Thus, the evidence presented tends to show at most that the unprotectable marketing scheme is recognizable by the general consuming public, but it does not clearly show that the protectable "total visual impact" of the interior decor is identified by consumers with Best Cellars. Evidence drawn from the wine and design industry media is certainly relevant to the strength of the mark, as is the distinctive nature of the trade dress involved, but the evidence permits reasonable fact finders to draw different conclusions about the strength of the mark. The strength-of-mark issue is thus not ripe for summary judgment.

### 2. Sophistication of the Purchasers

■ This factor requires the court to consider the general impression of the "ordinary consumer buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 746 (2d Cir.1998). Very little evidence has been presented concerning the sophistication of the consumer group. While the target consumers would appear to be wine novices, there is no evidence to support the contention that unsophisticated wine drinkers are generally unsophisticated consumers unable to distinguish between stores. Even drawing all inferences in favor of plaintiff, because there is so little evidence on this point presented by either party, this factor weighs in favor of neither party at this stage of the litigation.

### 3. Proximity of the Products

■ This aspect of the *Polaroid* test considers whether and to what extent the two products compete with each other, by considering the nature of the products themselves and the structure of the relevant markets. *See Cadbury,* 73 F.3d at 480. Both plaintiff and defendants are engaged in selling the same line of products: wine, with a specific focus on less expensive vintages. The structure of the relevant markets, however, may support an inference that the parties are not direct competitors.

The only stores currently in potential competition with each other are the New York stores. The defendants' flagship store is in Los Angeles, and the plaintiff has no store in California. Nor does the plaintiff operate stores in Colorado, Idaho or Arizona, the other states where defendants operate or license stores, and defendants do not have stores in Washington or Massachusetts, where plaintiff has stores. Plaintiff has produced no evidence tending to show that it competes with defendant in any market besides New York.

But whether "New York," or even "Manhattan," constitutes a single market for in-store retail sales of inexpensive wines is certainly a debatable factual issue. In spite of its demonstrated use of professional business, design and marketing strategies, plaintiff has offered no marketing studies showing to what extent Bacchus may be competing for New York customers with Best Cellars. In most parts of the country, retail wine stores located within two miles of each other would likely be direct competitors for the

---

**3.** Plaintiff does cite to articles about Bacchus in general media publications that mention Best Cellars. (Pl.'s Mem. Supp. Summ. J. at 32, Wesson Aff. Ex. 21.) On careful reading, however, it is clear that these articles focus on the similar marketing themes of the stores, rather than on the interior decor or total visual impact. These articles at most demonstrate that the stores are recognized as the same genre of store—specifically, stores that market wine by taste category.

same customers, but a reasonable New York jury would be more than justified in questioning whether stores carrying a limited stock of inexpensive wines, located in geographically and socially distinct neighborhoods of the City, are in direct competition at all. Plaintiff correctly notes that consumers from Manhattan's Upper East Side have been known to shop on the Upper West Side and vice versa, but the test is not simply about relative proximity but about competition of the products. Whether Manhattanites would get on public transportation to shop for a $10 bottle of wine, rather than systematically patronizing the nearest shop, is surely debatable, and the extent to which consumer confusion would be generated by occasional encounters with both shops is a question of fact about which virtually no evidence appears in the record so far, and about which reasonable people could disagree.

Because there is no evidence in the record about market structure to indicate extent of competition for customers in New York, this factor too cannot be said to weigh in favor of the likelihood of confusion.

### 4. Bridging the Gap

■■ This factor concerns the likelihood that, if the parties are not already in direct competition with each other, the plaintiff will enter into competition with defendant by selling the same product in markets where plaintiff does not yet do business. See Cadbury, 73 F.3d at 482. To whatever extent the East and West Sides of Manhattan are distinct markets, it is more than plausible that plaintiff would attempt to capitalize on whatever success it has had in one neighborhood by opening a store in

the other. There are disputed issues of material fact concerning this issue, however, because there is a dispute as to whether the New York State Liquor Authority will license the plaintiff to open another store in the State of New York. See Def.'s Mem. Supp. Summ. J. at 33; Pl.'s Mem. Opp. Summ. J. at 17. Defendants argue that Best Cellars received an opinion from the New York State Liquor Authority indicating that it is unlikely that Best Cellars will receive the necessary license, and plaintiff contends that it believes it *will* receive the necessary license. Predicting the likelihood of an as-yet-unreached decision of a state licensing authority is not a question that can be resolved on summary judgment.

### 5. Actual Confusion

■■ Very little evidence of actual consumer confusion has been presented. The only evidence plaintiff offers on this subject consists of magazine articles that note the similarity between the stores, and testimony by a Best Cellars principal about two conversations in which former Bacchus employees described questions asked by unidentified consumers about Bacchus, including whether the Bacchus store was a Best Cellars store. (*Id.* at 19; Wesson Aff. at ¶¶ 43–44.) Anecdotal evidence is admissible, within the district court's broad discretion, on summary judgment as well as at trial, to establish actual consumer confusion.[4] See Nora, 269 F.3d at 123–24.

■■ Plaintiff's slim showing of actual confusion does not support a finding of the likelihood of confusion. First, " 'de minimis evidence of actual confusion does not establish the existence of of a genuine

---

4. The Second Circuit has found that "there is no hearsay problem" in admitting such anecdotal evidence because it is not being offered to prove the truth of the matter asserted, but rather the mere fact that the declarant's statements were made may be probative of customer confusion. *Fun–Damental Too,* 111 F.3d at 1003.

issue of material fact regarding the likelihood of confusion.'" *Nora*, 269 F.3d at 124 (citing *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1535 (10th Cir.1994)). Second, "inquiries about the relationship between the owner of a mark and an alleged infringer do not amount to actual confusion," because they "are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself." *Nora*, 269 F.3d at 124 (emphasis added).

While a plaintiff is not required to demonstrate instances of actual confusion to prove liability, *see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir.1986), any evidence of actual confusion would be strong proof of probability of confusion. In the absence of any evidence in the form of marketing research or demonstrable incidents of actual confusion, such as misdirected orders from customers or shipments from distributors, and in light of the inconclusive and de minimis evidence offered by plaintiff, the Court finds that the plaintiff has not demonstrated any instances of actual confusion, and that this factor weighs against the likelihood of confusion.

### 6. Defendants' Good Faith

"This factor 'looks to whether the defendant adopted its [dress] with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 583 (2d Cir.1991) (*quoting Edison Brothers Stores,Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)). Plaintiff has presented conclusory assertions concerning defendant's intent to copy plaintiff's marketing strategy and interior design, but has been unable, after discovery, to locate any evidence of defendants' knowledge of Best Cellars' marketing or interior design prior to the opening of defendants' store.

This is in stark contrast to *Grape Finds*, where Judge Sweet found overwhelming evidence of bad faith on part of the defendant in that case, including the defendant's own admissions of intent to copy Best Cellars' interior and graphic designs. Plaintiff here has not presented any evidence tending to show that defendants sought to copy plaintiff's trade dress or mislead customers as to the identity of the defendants' store. The only evidence plaintiff has offered on this point is its incredulity that defendants could have come up with their marketing plan and interior design in less than a year without copying plaintiff's store, as well as minor inconsistencies concerning the sources of defendants' ideas.[5]

It is important to clarify, moreover, what kind of copying would constitute bad faith for purposes of this analysis. First, even if defendants did copy plaintiff's marketing concept, that marketing idea is not protectable trade dress. The copying that is at issue here would have to be of the total look or feel of the store. It is not clear that the overall appearance of the Best Cellars store was as widely publicized as its business plan or concept. Second, even if defendants did copy plaintiff's trade dress, "bad faith should not be inferred simply from the act of copying. [C]opying in order to market a functionally equivalent product might well benefit consumers, which is one of the aims of the Lanham Act." *Fun–Damental*,

---

**5.** Plaintiff's argument suffers from a certain circularity. It seeks to use the "fact" of copying to infer a likelihood of confusion, but the only basis for finding copying is the inference that the stores are too confusingly similar for the defendants not to have copied.

*Too,* 111 F.3d at 1005.[6] While intentional copying can raise a presumption of consumer confusion, *see Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 586 (2d Cir.1993), it is also true that "[t]he intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Streetwise Maps,* 159 F.3d at 745. Only the latter form of imitation is bad-faith copying.

There is no evidence in this record that at the time defendants adopted their trade dress for the opening of their Manhattan Beach store in 1998 plaintiff had any consumer recognition on the West Coast at all. Thus, even if a reasonable factfinder could infer that defendants deliberately copied aspects of plaintiff's design, the same reasonable factfinder could conclude that it is unlikely that defendant could have sought to benefit from plaintiff's nonexistent goodwill in California, or to mislead customers who had most likely never heard of plaintiff in the first place. On the other hand, a factfinder that concluded that defendants did intentionally copy elements of plaintiff's trade dress, could plausibly infer an intent to mislead from the circumstantial evidence. Because a factfinder could draw an inference of bad faith from the evidence on the record, but could also reasonably not draw that inference, the element of defendants' good faith in the design of the Bacchus interior decor cannot be decided on summary judgment.

### 7. Quality of Defendant's Product

Plaintiff presents conclusory assertions about the quality of the wines sold by defendants, claims that the wine in defendants' racks is "cooked" by the lighting system, and alleges poor quality construction of defendants' interior decor. (Pl.'s Opp. Summ. J. at 17.) However, no evidence expert testimony or marketing studies have been presented to indicate anything about the quality of the wine sold by either store. Nor is there evidence in the record concerning the quality of defendant's interior decor construction, save for testimony from the architect of the Best Cellars store, whom a fact finder might plausibly find biased. (Wesson Aff. ¶¶ 45–48, and Ex. 23 thereto). Plaintiff also alleges that defendants' stores have low quality descriptions about the wines they sell, yet provides only a self-serving affidavit in support of that argument. A jury could reasonably believe these assertions, but in regard to matters of opinion and expertise it could also discount these somewhat marginal criticisms of defendants' product as statements offered by interested witnesses. Once again, the present record does not dictate a conclusion in favor of either side.

### 8. Similarity of the Marks

In determining similarity of trade dress, courts are cautioned not to engage in a minute dissection of various elements of the mark, *see Girl Scouts of the United States v. Bantam Doubleday Dell Publishing Group,* 808 F.Supp. 1112, 1124 (S.D.N.Y.1992), *aff'd,* 996 F.2d 1477 (2d Cir.1993), but rather to focus on the "general impression conveyed to the public" by the appearance of the product, *Lang,* 949 F.2d at 581–82, or in this case, by the interior decor. This approach is dictated by the realities of the marketplace, since

---

**6.** This case exemplifies how consumers could benefit from imitation. Best Cellars asserts that its marketing concept of selling wines by taste was unique; apparently, before the advent of Bacchus, it had no competition from similarly-themed wine stores. To the extent that this marketing concept is attractive to consumers, the creation of additional, competing stores that marketed wine by taste would clearly benefit the public.

average consumers are unlikely to parse trade dress into its constituent parts when identifying products in order to make purchasing decisions. Rather, they will rely on the "total visual image" presented by the trade dress. *Jeffrey Milstein,* 58 F.3d at 31. For this reason, "the question is not how many points of similarity exist between the two packages," but rather the general impression conveyed. *Bristol–Myers Squibb,* 973 F.2d at 1046.

### Similarities and Differences Between the Stores' Trade Dress

In this case, it is undisputed that there are a number of similarities between the interior designs of plaintiff's and defendants' stores. Both stores have racks of wine arranged around the perimeter of the store. The wine racks store the wine bottles horizontally in what appears to be a grid of holes in a wall. Both stores have one display bottle of wine presented vertically above a column of that identical wine stored horizontally in holes. Both stores have a method of illuminating the wine racks from behind the wine bottles. Both stores separate wine into eight taste categories, in addition to one to two other non-taste-based categories. Each taste category is identified by single words describing a taste property. Both stores have a farm table for display. Both stores have signs above the wine racks indicating the category stored in that area. Both stores use index card identifiers posted at eye-level on the wine racks describing individual wines. Both stores use different individual colors on signs and index cards to identify the categories of wine. Both stores sell books about wine as well as wineglasses and other items related to wine drinking. Both stores stock approximately 100 different varieties of wine that retail for less than 20 dollars a bottle.

On the other hand, it is also undisputed that there are a number of dissimilar elements between the store designs. Plaintiff's dominant building materials are blonde wood paneling and stainless steel detail, while defendants use primarily white stucco and dark-brown stained wood beams. Plaintiff's store prominently features large color-coded signs containing unique computer-generated graphics that serve as iconic identifiers for the different categories of wine. In fact, plaintiff has won numerous awards for its computer-generated graphics and has sought and received trademark protection for those graphic designs. Defendants utilize no such icon-coding system, and rely instead on tarnished-looking metal signs with no pictorial image to identify the different categories of wine. The lettering of defendants' category signs appears to be roughly cut out of the sheet of metal that comprises each sign. While each sign is of the same colored metal, the lettering of each sign is in the unique color associated with the category of wine. Plaintiff's and defendants' stores use different colors and different names to delineate categories of wine. Plaintiff has sought and received trademark protection for the specific words used to identify six of its eight taste categories. Plaintiff does not allege that defendants infringed any trademarked element of plaintiff's trade dress such as the icon identifiers or the specific category names. The only graphic image associated with defendants' store is a classically-styled painted "fresco" of Bacchus, the Roman god of wine for whom the store is named. In contrast, plaintiff's trade dress does not associate its store with any personality, either human or divine, and plaintiff's store features modern computer graphic images, not faux-classical painted images. The names of the stores too are not similar. To state the obvious, the name "Best Cellars" is a play on words,

punning between a "best seller" as a popular consumer item, and a "best cellar" in the sense of a superior wine collection. The name "Bacchus" straightforwardly references a mythological enjoyer of wine. It is undisputed that the store names figure prominently in both defendants' and plaintiff's respective trade dress.

### Overall Visual Image

What *is* disputed is the overall effect of the interior decor of the wine stores on consumer perception of those stores. Courts are instructed to proceed very carefully with respect to the similarity of the overall impression of trade dress, because issues of consumer confusion are normally factual in nature and thus rarely appropriate for summary judgment. *See Universal City Studios,* 746 F.2d at 116. A judge can look at photographs of the respective stores and form his or her own opinion of how similar they appear. Undoubtedly, there will be cases where the similarity is so patent, or the divergence so dramatic, that reasonable jurors necessarily must agree that the appearances are either closely similar or distinctly different. But in most cases, the subjectivity of perception counsels judges not to assume that their assessment of overall similarity will necessarily be shared by all reasonable jurors. In this case, as is apparent from the listing of similar and different features of the stores' trade dress, the question is really whether the similar features or the divergent ones dominate the viewer's response to the overall "look" of the stores. This is a matter about which reasonable people can easily differ.

In this case, moreover, the interaction of marketing theme with trade dress presents an additional complication. "'[A]n idea, a concept, or a generalized type of appearance' cannot be protected under trade dress law, although 'the concrete expression of an idea in a trade dress

has received protection.'" *Grape Finds,* 90 F.Supp.2d at 451, *quoting Jeffrey Milstein,* 58 F.3d at 32–33 (internal citations omitted). The idea of marketing wine by taste, however innovative it may be, is not protected by trade dress law, and Best Cellars cannot invoke the Lanham Act to preserve a monopoly on operating retail stores that categorize wines by taste. "Uniqueness of an idea and not the trade dress itself is not a proper basis upon which a court can base a finding that a trade dress is capable of being a source identifier. The connection must be between the trade dress and the product, not the idea and the product." *Sports Traveler,* 25 F.Supp.2d at 163.

In this case, plaintiff claims, in effect, that its (formerly) unique marketing style is part of its trade dress. Uniqueness of marketing style is not a factor in the *Polaroid* test, and this Court will discount marketing theme in its analysis of the similarity of the trade dresses because that alone is not the focus of the legal inquiry. When the analytic focus is trained on trade dress, that is, on the general appearance of the interior decor of the stores which includes a marketing concept, rather than on marketing ideas alone, then the stores appear similar in some key respects, and dissimilar on others. Plaintiff's store is characterized by light wood paneled walls, stainless steel finishings and brightly colored computer-generated icons. Defendants' store, by contrast, presents an atmosphere distinguished by white stucco walls with dark wood beams, rusted metal signs, and a classically-styled painting of the Roman god of wine. Rather than slavishly imitating plaintiff's decor, defendants have deviated from it in very significant ways. The similarity of the wine rack system is apparent, but is merely one element in the general appearance of the stores. The similarity of the categories of

wine is also apparent, but the stores use different names for the categories and different colors associated with the categories as well as very different signs. Reasonable viewers could well disagree about whether the similarities outweigh the differences, or vice versa, in determining the overall similarity or differences of the decor.

### 9. Conclusion

Because in this case the similarity of the marks element is at the heart of the consumer confusion prong of the trade dress infringement test, and because reasonable minds could disagree as to the degree of similarity, this question is not suited for summary judgment. For this reason, and because there are material issues of fact as to virtually all of the *Polaroid* factors in this case, plaintiff's and defendants' cross-motions for summary judgment on the Lanham Act 43(a) claim for injunctive relief are denied.

■ However, plaintiff has produced insufficient evidence at summary judgment from which a reasonable jury could conclude that there is actual consumer confusion as to the relationship of the Bacchus and Best Cellars stores. A plaintiff who seeks money damages under the Lanham Act Section 43(a) must include evidence of actual consumer confusion, while a plaintiff seeking injunctive relief under that statute need only show a likelihood of confusion. *See Resource Developers*, 926 F.2d at 139–40. Because plaintiff has not shown actual consumer confusion, *see* pp. 22–24 above, the plaintiff's claim for money damages under Section 43(a) of the Lanham Act is dismissed.

### III. *Trade Dress Dilution*

■ In addition to the Lanham Act claim, Best Cellars also seeks injunctive relief under the Federal Trademark Dilu-

tion Act ("FTDA"), 15 U.S.C. § 1125(c), for the alleged infringement of its trade dress. Under that statute,

> [t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.

15 U.S.C. § 1125(c).

The Court's conclusion that there are genuine issues of material fact regarding the likelihood of confusion does not preclude summary judgment on the dilution claim, because the likelihood of confusion is not the controlling issue on such a claim. Rather, the statute defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127.

The standard for a trade dress dilution claim is set forth for this circuit in *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir.1999). Under *Nabisco*, the plaintiff must establish the following elements: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Id.*

Thus, the first prerequisite of a valid trademark dilution claim is the fame of the senior mark—in this case, the interior decor trade dress of Best Cellars. The FTDA sets forth eight non-exclusive factors to consider in determining whether a

trade dress is famous. They are: (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark in connection with the goods; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the trading area in which the mark is used; (5) the channels of trade for the goods or services with which the mark is used; (6) the degree of recognition of the mark in trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (7) the nature and extent of the use of same or similar marks by third parties; and (8) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. 15 U.S.C. § 1125(c)(1).

While there is not a great deal of case-law determining whether marks are "famous," the Second Circuit has suggested that Congress likely meant to protect trademarks that had become "household words," and that "it seems most unlikely that [in passing the FTDA] Congress intended to confer on marks that have enjoyed only brief fame in a small part of the country, or among a small segment of the population, the power to enjoin all other users throughout the nation in all realms of commerce." *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 99 (2d. Cir.2001). The House Report accompanying the FTDA cited Dupont, Buick and Kodak as marks with sufficient

fame among consumers to be eligible for protection under the FTDA, *see* H.R.Rep. No. 104–374, at 3 (1995). The well-known Pepperidge Farm Goldfish cracker has received dilution protection under the FTDA, *see Nabisco*, 191 F.3d 208, and the widely-recognized Victoria's Secret national chain of lingerie stores has recently been the subject of an FTDA case before the Supreme Court. *See Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003).

While Best Cellars has demonstrated the inherent distinctiveness of its trade dress under the summary judgment standard and thus meets the first factor of the FTDA's fame test, it has not demonstrated a degree of consumer awareness of the trade dress sufficient to establish its fame for purposes of the *Nabisco* test. Best Cellars provides no marketing studies or other indicia of consumer awareness of its trade dress. There is no evidence of a nationwide advertising campaign emphasizing the trade dress, and as elaborated in the previous section discussing strength of the trade dress, there is little evidence that the interior decor is widely known or associated by consumers with Best Cellars, beyond a relatively narrow group of professionals in the wine and interior design industries.[7] Best Cellars has used its mark for some 6 years, in an area geographically limited principally to certain parts of New York, Boston and Seattle.[8] There is no simply no evidence in the

7. To be more precise, plaintiff has offered evidence that its design has been publicized by articles and awards in trade publications in these industries, but it has offered no evidence of how widely the awareness of these articles has spread even within these limited circles, and it is not clear that an awareness that Best Cellars has been praised for its innovative design translates into a recognition of the design as a mark of origin or ownership even within this narrow group. For the sake of argument, however, the Court accepts

the proposition that the trade dress is recognized within certain limited professional circles as associated with Best Cellars.

8. Given the likelihood that wine shops serve particularly localized market, it might well be the case that the reach of experience with Best Cellars shops among consumers is limited to certain neighborhoods or districts of those cities.

record to support plaintiff's claim of the "wide, national consumer acceptance of its stores' look." (Pl.'s Mem. Supp. Summ. J. at 38). Examining all evidence on the record, and resolving any ambiguities in favor of plaintiff, it is fatuous to claim that the distinctive look of the Best Cellars store is a "famous" mark comparable to those that Congress intended to protect by the FTDA. For this reason, defendants are entitled to summary judgment on the claim of dilution of trade dress under the FTDA, and that claim is dismissed.

## IV. *Unfair Competition*

In addition to the federal statutory claims discussed above, Best Cellars also brings causes of action for unfair competition against defendants under the laws of the States of New York, California, Arizona, Colorado and Idaho, seeking both money damages and injunctive relief.

▮▮▮ Under New York law, a common-law claim for unfair competition rests on "the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein,* 58 F.3d at 34 (internal citations omitted). To establish such a claim, the plaintiff must prove (1) that the defendant acted in bad faith, and (2) *either* (a) actual confusion, in order to obtain money damages, *or* (b) likelihood of confusion, in order to obtain equitable relief. *See id.,* at 34–35. This issue cannot be resolved on a motion for summary judgment because, as explained in the preceding section, there are disputed issues of material fact as to

both the good faith of the defendants and the likelihood of confusion. For the same reasons discussed above with respect to the Lanham Act, however, while the claim for injunctive relief under New York unfair competition law survives summary judgment, the claim under New York common law for money damages must be dismissed, as plaintiff has not presented a genuine issue as to actual consumer confusion.

As to the unfair competition claims under the laws of California, Arizona, Colorado and Idaho, plaintiff appears to have largely abandoned those claims, or at least, has completely neglected to address those claims in its briefing papers. Plaintiff has presented no reason to think that its rights under the laws of any other state are any broader that those already available under federal or New York law.[9] Nor is there any evidence in the record that plaintiff does business in those states. While plaintiff does provide two anecdotes of instances concerning consumer queries about the relationship of Bacchus to Best Cellars (one anecdote concerning Bacchus customer queries in Idaho, the other in Colorado), such meager evidence cannot carry these causes of action beyond summary judgment. Because there is no evidence in the record from which a fact finder could reasonably draw the conclusion that there is a likelihood of customer confusion between Bacchus and Best Cellars in California, Idaho, Arizona or Colorado, the claims for unfair competition under the laws of those four states are dismissed.

---

9. Unfair competition law in California has been codified. Under California law, in the context of a trade dress infringement case, "[a]n action for unfair competition under Cal. Bus. and Prof.Code §§ 17200 is 'substantially congruent' to a trademark infringement claim under the Lanham Act.... Under both, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.1991) (internal citations omitted). There is no reason to believe that the laws of the other states in question provide a different standard.

## V. *Prior Use and Geographic Expansion*

Finally, defendants argue that under federal common law as articulated in the pre-Lanham Act *Tea Rose–Rectanus* line of cases, the Court may not enjoin the defendants from operating in California, Arizona, Colorado or Idaho, because defendants are prior good faith junior users with superior rights to the mark in territories remote from the senior users. Def.'s Mem. Supp. Summ. J. at 38, citing *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916) (*"Tea Rose"*), and *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918).

■ While the Second Circuit has not had cause to address this doctrine in some 35 years, under the majority interpretation of the *Tea Rose–Rectanus* doctrine, in order to prove the defense the junior user (here, defendants) must prove both that (1) its first use of the mark was in good faith, and (2) its first use of the mark was in a remote area, that is, an area where the senior user's mark was not known such that there could be confusion as to source. *See Rectanus,* 248 U.S. at 100, 39 S.Ct. 48 (noting that markets are "remote" if "the mark means one thing in one market, an entirely different thing in another."). *See generally* McCarthy on Trademarks, § 26:4.

The merits of this argument cannot be decided on a motion for summary judgment because neither the confusing similarity of the trade dresses, nor the good faith of the junior user in adopting its trade dress, has been established. At any rate, any question as to the extent of injunctive relief plaintiff might be entitled to if it prevails on the merits is premature at this state of the case.

*CONCLUSION*

For the foregoing reasons:

(1) Plaintiff's motion for summary judgment is denied.

(2) Defendant's motion for summary judgment is granted as to plaintiff's claims for (a) monetary damages under Section 43(a) of the Lanham act and under New York state unfair competition law, (b) dilution under the Federal Trademark Dilution Act, and (c) relief under the state unfair competition laws of Arizona, California, Idaho and Colorado. Judgment for defendants will be entered on those claims.

(3) Defendants' motion for summary judgment is denied as to plaintiff's claims for injunctive relief under the Section 43(a) of the Lanham Act and under New York state unfair competition law.

SO ORDERED.